Harper, Ch.
The bill charges that, in 1818, the defendants, Drury Sawyer and Matthias duattlebaum, executed a *411 promissory note to the complainant, John Hipp, for three hundred and fifty dollars, on which note the said complainant after-wards recovered a judgment against the makers, at April Term, 1821. That pending the suit on the note, the defendant, Drury Sawyer, confessed a judgment to the defendant, Micajah Martin, for the sum of $8,377 ; which confession is charged to have been without consideration and fraudulent, and intended to defeat complainant’s judgment, and the bill prays that it may be set aside, and the said Micajah Martin compelled to account for the money he has received on it.
The bill also charges that the note mentioned was given for a negro slave, sold ostensibly to Sawyer; but that Martin and Sawyer were partners in the business of buying and selling slaves, and that the purchase was, in fact, made on the joint account, and that Martin is liable as partner (Sawyer being insolvent) for the amount of the purchase money.
The bill also charges, that pending the suit on the note, the defendant, Matthias Q,uattlebaum, executed two deeds to the defendant, Andrew Sheely; by one of which he conveyed to Sheely most of his personal property, in trust for his (Gtuattle-baum’s) wife, and by the other a tract of land to Sheely’s own use. These deeds are charged to have been fraudulent.
The complainant, John H. Yanzant, is also a judgment creditor of Drury Sawyer, and claims to set aside the judgment of Martin. His judgment was recovered in 1823.
I shall first consider Sheely’s part of the case. There was little dispute, that the conveyance of the property in trust for Quattlebaum’s wife, must be considered fraudulent as to creditors. It purports to be voluntary, and he was very considerably indebted at the time; and, among others, owed the debt to complainant. The chief dispute was concerning the conveyance of the land to Sheely’s own use. This purports to have been in consideration of $2,000, but was charged to be voluntary. The circumstances chiefly relied on to show the fraudulent character of this conveyance, were, that it was executed at the same time with the deed for the personal property, which is *412 obviously fraudulent, and must be considered part of the same transaction, and that Quattlebaum has remained in possession of the land ever since. These circumstances certainly raise a strong presumption against the deed. That at the very time of executing a conveyance for putting his personal property out of the reach of creditors, he should sell his land to the trustee of that fraudulent deed, is of itself suspicious; but the suspicion is very much heightened by the fact that he continued in possession as owner after the sale. The vendor’s continuing in possession of land after a sale, does not of itself constitute fraud, as in the case of a chattel. As observed by Roberts, (Fraud : Con. 549,) “ where land is conveyed, the want of possession casts a less degree of suspicion on the transaction, than where goods are the subject of the conveyance; for, with respect to lands, the property is evidenced by the possession of the title deeds, and manual occupation is no criterion of ownership.” Yet certainly, that the grantor should remain in possession, as before, as apparent owner, paying no rent, is evidence that the sale was colorable, and that some trust for the grantor was intended. An attempt was made at the hearing to prove that a consideration was paid. This was principally by the evidence of Michael Barr, who stated that he transferred to Henry Sheely, a brother of the defendant, Andrew Sheely, a note of hand, executed by Quattlebaum as principal, with defendant and John Sheely as sureties, and he did not doubt but Andrew Sheely paid it off— he did not know but Henry Sheely told him so. The same witness stated his impression that defendant, Sheely, had paid off a debt of Quattlebaum to one Eigleburger — perhaps Eigle-burger told him so. This is very imperfect proof; but it was urged that Henry Sheely and Eigleburger, who could have proved the payments explicitly, are dead. Yet, it may be asked, if defendant took up the note, why is he unable to produce it, or why did he not take a receipt from Eigleburger ? These, to be sure, may have been lost, or he may have neglected to take them; but there is too unusual a concurrence of unfortunate circumstances. Nor, if defendant did pay off these *413 debts of Q,uattlebaum, does it follow that it was on account of the land. It was not contended at the hearing, however, that defendant had paid to the amount of the consideration stated in the deed ($>2,000). Indeed, the answer of Sheely states that he paid but $700 or $800. Now, if this had been proved, I should think the difference between the actual payment and the ostensible consideration, a strong circumstance against the deed. It does not follow, that because a consideration was paid, a conveyance cannot be fraudulent as to creditors. In Twine’s case, there was a consideration. Even if the full value were paid, and it appeared that the transaction was concerted between the grantor and grantee, to enable the former to defeat creditors, by changing his land into money, which he could more easily'put beyond the creditors’ reach, I presume the conveyance would be considered fraudulent. Lord Mansfield says, in the case of Cadogan vs. Kennet, Cowp. 434 — “ But if the transaction be not bona fide, the circumstance of its being done for valuable consideration will not alone take it out of the statute. I have known several cases where persons have given a fair and full price for goods, and where the possession was actually changed, yet being done for the purpose of defeating creditors, the transaction has been held fraudulent, and therefore void.” He instances the purchase of a house and goods with a view to defeat a sequestration out of Chancery, and of goods to defeat an execution, and adds : “ The question, therefore, in every case, is, whether the act done is a bona fide transaction, or whether it is a trick and contrivance to cheat creditors. If there be a conveyance to a trustee, for the benefit of the debtor, it is fraudulent.” The inserting of a false consideration in the deed, shews the transaction to be in some degree colorable. It indicates that they thought the true consideration inadequate and insufficient to support the deed. It may be that defendant Sheely paid some debts on account of Quattlebaum; that he intended him, nevertheless, to hold the land, not subject to the claims of creditors, and that he thought this a benevolent and unexceptionable *414 transaction; but the law pronounces it fraudulent. It was a secret trust for the debtor.
We are next to consider the case of the defendant Martin. So far as he is sought to be charged as the partner of Drury Sawyer, in the purchase of the slave for which the note to the complainant Hipp was given, I think there is no ground for the bill. According to the evidence, complainant made his contract with Sawyer alone; Martin expressly declined to be concerned in the purchase; complainant refused to have any thing to do with him, and chose his own security by taking the note. It seems to me perfectly immaterial whether any arrangement' was made between Sawyer and Martin, that the slave should be on their joint account. Complainant could have no remedy at law, and I perceive no ground for coming into Equity. I think there is evidence enough, that, to some extent, Martin and Sawyer were connected as partners, in buying and selling slaves — indeed, Martin admits, in his answer, that it was intended, 'in the first instance, that he should be concerned in the purchase in question — but that can make no difference, when complainant expressly understood and agreed that he was not to look to Martin for his money, but to Sawyer and his surety Quattlebaum.
The more important part of Martin’s case, however, relates to the judgment confessed to him by Drury Sawyer, which is charged to have been fraudulent, and on which Martin, in his answer, acknowledges to have received upwards of $1,500. It appears that in June, 1817, the defendants Martin and Drury Sawyer formed a partnership in trade, which was dissolved before September of the same year: again renewed in November, 1818, and finally dissolved the following winter, by Martin’s selling out his interest in the concern to George Sawyer, the brother of Drury, who executed to Martin a bond in the penal sum of two thousand dollars, conditioned to indemnify him against the debts of the late firm. In 1821, as Martin alleges in his answer, a settlement was made between himself and Drury Sawyer, by one Harrington, an accountant, on which occasion *415 Sawyer fell in debt to him $8,377, and gave his note of the date of 3d of February of that year, and on the 5th of February confessed a judgment for the amount. On the settlement, as Martin’s answer states, “ it was agreed that this bond of two thousand dollars should be delivered up to George Sawyer, upon the amounts (after deducting the payments mady by Drury and George Sawyer of the debts of the concern) being included in the judgment: that the balance of the said bond (this defendant thinks about fifteen hundred dollars) was included in the judgment confessed by Drury Sawyer to this defendant: the' balance of the judgment was for money paid in Charleston for goods of the concern, on notes which defendant held against him, and for money for which the defendant was liable as security and has paid, and for money for which he is liable, to the amount of between eight and nine hundred’ dollars, which this defendant has not as yet paid.”
The complainants impeach the judgment from various circumstances. First, they rely on the testimony of the witnesses, Nicholas Vanzant and Caughman, to Martin’s admission, at the time of his selling out to George Sawyer, that Drury Sawyer owed him nothing, and the improbability of so large a debt being contracted up to the 3d of February, 1821.
Then the improbability of so large a debt being due on- the settlement of so inconsiderable a concern. According to defendant’s own testimony, the entire aggregate of goods purchased during the continuance of the partnership amounted to $8,400. Martin was by far the most efficient and intelligent person of the concern, and it was unlikely that he should permit Sawyer to get so much in his debt. If goods were paid for in Charleston during the continuance of the firm, the presumption is that they were paid for with the partnership funds.
The confession of judgment to Martin was made during the pendency of the complainant, Hipp’s, suit against Sawyer, and just before the judgment was recovered ; and though a debtor may, without fraud, prefer one creditor to another, yet the circumstance is entitled to considerable weight, when the trans *416 action is otherwise of so doubtful a character as the present. According to Twine's case, the making of a conveyance in satisfaction of a debt during the pendency of the writ, is one of the badges of fraud, and the confession of a judgment comes within the same reason.
According to the testimony of George Sawyer, when the property of Drury Sawyer was exposed to sale under the execution of Martin, the witness purchased to the amount of about $>200, for which he gave his note to Martin. This note was afterwards given up, without being paid, and Drury Sawyer remained’in possession of the property he had bid off.
Complainants also rely on the testimony of Amos Banks, that having a demand against Drury Sawyer, he had threatened, if he were not paid, to file a bill in Equity against Martin & Sawyer, and impeach this judgment, and that he was after-wards paid, but did not know by whom. Complainants leave it to be inferred, that the payment was made by Martin, induced by his consciousness that the judgment was liable to be impeached.
According to Martin’s own answer, the debts of the firm in Charleston, for which he was liable as partner, were included in the judgment, and also the amount of the bond given to indemnify him against those debts. This, at the hearing, was supposed to be in consequence of mistake or inadvertence. But besides the improbability of such mistake, it shows it to have been a loose transaction, and adds to the probability of its being huddled up to defeat complainant’s demand.
Defendant, Martin, states that the bond of indemnity was given up to George Sawyer, on its amount being included in the judgment. George Sawyer, who was sworn on his behalf, stated that Martin told him he gave up the bond on Drury Sawyer’s representation that there was enough due to the firm on the books to pay off the debts ; Martin having possession of the books and going on to collect debts.
A great deal of testimony was produced on the part of the defendant, Martin, to show a consideration for the judgment; *417 of which I do not think it necessary to enter into a minute examination. In general, it was of a vague and inconclusive character, and such as would have been proper on a reference to account. A reference had been ordered in the case, but it seems that the account could not be made out before the Commissioner, and the reference was abandoned. It may be said, in general, that there was no evidence that anything was actually due from Drury Sawyer to Martin, at .the time of the dissolution of the firm ; but the evidence of Vanzant and Caugh-man to the contrary. The only liability on account of the firm was the debt to O’Neal of $1880. Of this, $1250 had been paid before the settlement of 1821. It does not appear from the receipts annexed to'the record of O’Neal’s judgment, by whom these payments were made or with what funds. The balance of this debt appears to. have been paid by Martin ; but, according to George Sawyer’s testimony, Martin gave up the bond of indemnity because he supposed that, having the books, he could collect enough of the debts of the firm to pay it off. It is true, he ádded that he supposed Martin had collected very little — nofr\ to the amount of $100. But this could not be known without an account and the production of the books, which -are or were in Martin’s possession. In fact, the testimony tended merely to make out a one-sided account. It was in evidence, that Martin and Drury Sawyer were much connected in their transactions after the dissolution of the partnership, and I am satisfied they were connected in the business of buying and selling slaves. I therefore think it unnecessary to consider the testimony as to the other particulars in which defendant, Martin, endeavored to show that he was under liability for Sawyer. No satisfactory conclusion can be drawn with respect to them. I am of opinion that the presumptions against the judgment are strong enough to impose on the defendant the burden of showing that it was' bona fide and founded on consideration, and that he has failed to do so. ■ Roberts, in his treatise on fraudulent conveyances, (p. 490) says, “ though the debt be bona fide due, the judgment, quoad other creditors, may be mala fide confessed, i. e. may be' *418 confessed with intent to delay, hinder or defraud others of their just and lawful actions, and such intent is to be collected from the circumstances of each case.” In the present case, I am not satisfied that any debt was bona fide due ; but if there was, or if defendant was under liabilities against which he was not sufficiently secured, I am satisfied the judgment was mala fide confessed, for an extravagant amount, with intent to cover all the property of Sawyer, and to hinder and defraud other creditors.
It is therefore ordered and decreed, that the deed of trust of certain personal property, executed by the defendant, Matthias Quattlebaum, to the defendant, Andrew Sheeley, on the 10th of March, 1821, to the use of Catharine Quattlebaum, and also the conveyance of a tract of land to the use of the said Andrew Sheeley, executed on the same day by the said Matthias Q.uat-tlebaum, be set aside and given up to be cancelled, as fraudulent and void, and that the said land and personal property, in the possession of the said Andrew Sheeley or Matthias Quattle-baum, or so much thereof as may be necessary, be sold by the Commissioner of this Court, for the satisfaction of the judgment of the complainant, John Hipp: And it is further ordered and decreed, that the judgment confessed by the defendant, Drury Sawyer, to the defendant, Micajah Martin, on the fifth of February, 1821, be set aside as fraudulent, and satisfaction thereof acknowledged by the said Micajah Martin, and that the said Micajah Martin account before the Commissioner for all monies or property which he has received on account of the said judgment, and pay what shall be found due on the coming in of such account, first towards the satisfaction of the complainant, John Hipp, and next towards the satisfaction of the judgment of the complainant, John H. Vanzant. Defendants to pay the costs.
On appeal, this decree was affirmed by the Court of Appeals.